The Good morning. Good afternoon. If it may please the court, my name is Jonathan Ball. With me at Council's table is Jennifer Moore. We're from the law firm Greenberg Torte and we represent Appellant Lang in this appeal from the Patent Office. Today I would like to focus on two errors of law that were committed by the board in holding Dr. Lang's patent claims obvious under Section 103. The first of those is that the Patent Office failed to establish that there would have been a reasonable expectation of success in achieving the subject matter of Dr. Lang's claim. The claim is a method claim and it has the limitations of achieving improvement in shelf life and in particular improvement in shelf life of about 10% or greater. The board analyzed the claim as if it were merely a composition. The board's decision is clear. The board says, and this is 814 of the joint appendix, the board says that combining the prior art, quote, appears to yield predictably the use of glycerin, alpha-amylase and multigenic amylase as anti-scaling agents in a doughnut batter in the amounts claimed. So the board is saying that it would be obvious to take these three key ingredients from Dr. Lang's method claim and put them together into a composition. But that is not what the claim is. The claim is a On that 10% limitation question, I think the government, and they can speak for themselves obviously, but I understood them to be making two arguments. One is that there's a waiver argument that this was not raised that the 10% was a limitation. And two, aside from the waiver argument, that this is simply a result and therefore not a limitation. So why don't you speak to those arguments? Sure. As to the waiver argument or the fact that we didn't address it, I have to say that from the get-go in the examination before the examiner, our arguments in front of the board and our arguments to this court, front and center, has always been the fact that we contend that the prior art would not have led to a reasonable expectation of achieving any shelf-life extension. So I would agree that the 10% is not something that we were hanging our 10%, 10% or 50%. The prior art would suggest that the combination of ingredients would make matters much worse. It would lead to have been expected. So it's not 10%. I understand your other arguments go to the fact that there has been no motivation because the assumption would have been that it makes matters worse. But I'm having difficulty with a reliance that you seem to place when you started your remarks on this particular 10% result that somehow being the limitation other than simply a result, a necessary result of the prescribed combination. The board certainly recognized that we were arguing this wearing loss. That by arguing that there wouldn't be an expectation of achieving shelf-life extension, we were arguing the limitations of the wearing loss. And whether that includes the 10% or not, I submit is not really material to deciding the issues here. But even if it is, the board recognized that in their opinion they referred to the 10% limitation, the board, not the PTO, not the solicitor. So I would submit that the board understood that that was part and parcel of our argument throughout. But again, I think it's not necessary to even reach that because our position is that the prior art, particularly the Barrett reference, which is the closest prior art, would have unambiguously taught to those of skill in the art that the combination of the three key ingredients that are recited in the patent claimant issue would have made matters worse. It would have led to increased staling. And so whether it's 10% or 1% doesn't seem to matter from our point of view. I thought your argument of using the 10% was simply that the separate ingredients, none of them produced a 10% extension in shelf-life. However, one chooses to read the prior art that you say teaches the way, that's a difficult conclusion to draw. The conclusion, if I understand the question, the conclusion that we're suggesting would be there's only one reference in the record, and this is not in dispute, there's only one reference in the record that has these three ingredients. That's the Barrett reference. And it studied the precise combination of these three ingredients to see would it be possible to extend shelf-life. And the data from that article, from that Barrett article, shows the opposite. Unequivocally, it shows that the combination of these three ingredients, of all the breads studied in that article, they were the hardest breads over storage, the firmest, the stalest. And that includes breads that had nothing done to them. In other words, compared to the control breads that had no anti-staling agents whatsoever, plain bread, that this combination of three ingredients made matters worse. So how do you distinguish that other than limiting your claims to doughnuts? Well, so our claim is a method claim, and it's directed to a method of making doughnuts. So if the question is, is why does our claim work? Why does our claim achieve 10% improvement, whereas the prior art suggested that you get something different? I think that the correct answer to that is, is because it's a method claim, it's method steps, and it is in a doughnut, it's not in the bread. While not part of the claim, not part of the record, my understanding is that by processing the doughnut under the conditions set forth in the claim, that the control over the activity of these enzymes and of the glycerin, and this is, you know, whether the inventor understands why the invention works has never been required under the patent law. This is what's explained to me, is that by doing it in a doughnut, for whatever reason, the control over those process conditions leads to a beneficial result. But that couldn't have been predicted from the prior art. There was no example in the prior art of taking these three ingredients, or even two of the ingredients, any of the enzymes, and actually making a doughnut and testing to see, does it extend shelf life? Does it have to be, I mean, you're relying a lot on the fact that the Barrett reference has all this testing and things like that, which certainly it's a good reference for you, but does the prior art have to show actually testing, or can it just suggest a method that will work? I don't think the prior art does have to show testing. Well, that's a good question. Can it just suggest a method? Because I think the Williams-Wesson reference comes pretty close to suggesting it may not have all three things, but it certainly talks about combining enzymes and glycerin, doesn't it? I will grant that the Barrett reference discusses, it says, additional anti-staling agents that may improve shelf life, so there's some equivocation there, but it says glycerin and alpha-amylase, and we've never contested that it does that. I guess what I'm getting at is, if we're looking at this as kind of a substantial evidence question about whether the prior art teaches the way or not, you have a really good piece of prior art teaching away in your pocket, but the PTO has a couple pieces that may not be as good, but may satisfy the substantial evidence standard. So, two points I'd make on that is, one, and this court has, well, certainly the predecessor court has recognized the primacy of data, of scientific experimental data, and that's the Caldwell case, and it's in But the fact of the matter is, scientists, when they look at data... That would be particularly helpful if the data actually pertained to donuts instead of bread, and particularly, I think it was MRE bread and certain kinds of white bread, so it seems to me that that may not be as good of data as you think it is. On that exact point, we submitted a 132 declaration by a food scientist. This is a doctor with 25 plus years in the baking industry. He submitted a 132 declaration, and what he said is that it was informative. He said, to those of skill in the art, the Barrett article, the closest prior art that teaches away, he said the Barrett article is far more informative, far more persuasive to those of skill in the art than what he characterized as generalized teachings of Williams, of the other cited references, and the reason that this expert said is because Barrett has data, and scientists rely on data more so than just generalized teachings, so in weighing this, to your point, Judge, in weighing these, you know, teachings... The board talked about that, I believe, and they said the declaration just indicates that the benefit of combining these three is not significant, and then they weighed that against other evidence, and they said it doesn't support the conclusion that one skilled in the art would not reasonably expect conventional anti-staling agents to function suitably as anti-staling agents in fried donuts. Don't we defer to the board on those kinds of analyses? I don't think we can defer to the board, or I don't think the court can defer to the board on an analysis that's just not supported by the evidence. The Barrett declaration itself, it's in the record, and it's clear. I mean, Dr. Barrett... Well, as I said, I guess I'll parrot what Judge Hughes was pointing out, which is this is an anticipation, this is obviousness, so you don't need one record, and if you look at Williams and the other two, you get a combination that includes all three ingredients in achieving anti-staling results, right? You have a combination that the board cited that include each of the three ingredients. Now, we have never conceded that they are in a donut or they provide any data whatsoever. Williams, the primary reference, has zero data to indicate. In fact, the example is in a bagel, and it doesn't include either of these ingredients. So, we have... I'm sorry, I didn't understand what you were saying. It doesn't include either of these... The Williams reference, the primary reference. The only example in there is a bagel. It's not a donut. It doesn't even include glycerin, and it doesn't include alpha-amylase enzyme. So, really, what Dr. Urbanski was saying is when you look at these and you weigh them, how can that, which doesn't even have the combination, how can that outweigh Barrett, which has the combination, and studied it specifically for this purpose and showed that that combination, for whatever reason, it does not work. It makes it worse. Here's your problem, though. You're talking to us about how can that outweigh it. Our job is not to re-weigh these, though. It's to look at the board's conclusion and see if this is enough. And you may disagree with the weighing, and we may disagree with it, but the other references, even though they don't have good data, suggest using all of these ingredients. And a person of ordinary skill, then, would probably look at these and say, look, I can use these three ingredients. Let me try it out and come up with your method. The board never says that there would be a reasonable expectation of achieving shelf-life extension, of achieving the method that Dr. Lang claims. They just say it would be predictable that you could put them together into a dough. But that's not what the claim is. The claim requires achieving the shelf-life extension. There is nothing... Well, you're back to where we started, which is whether or not 10% is a limitation. I think any improvement, 1%, 2%, it's certainly a limitation that there has to be some improvement. And what the board did here is that they didn't consider Barrett. They didn't consider the Urbanski Declaration head-on. They didn't say, well, let's take these teachings that go against us and let's reevaluate it into the mix of all these references and see, do we still have a prima facie case? They didn't do that. They just tried to take jabs at the Urbanski Declaration and at the Williams Declaration. They really said they find it unpersuasive. And this is remarkable. They said that the Urbanski Declaration is unpersuasive because it's attorney argument, that we never established that what happens in the bread is relevant to what happens in a donut. And for that reason, they said that it's unpersuasive and they set it aside. But, well, first of all, to the extent that burden was on us, that was discharged by the Urbanski Declaration. Dr. Urbanski said it is informative. It's more informative, in fact, is what he said. Secondly, this whole thing is a new ground of rejection. It's an improper new ground of rejection because it's not labeled as such. The thrust of the rejection, the board changed it entirely. The board looks to the motivation from Barrett itself. The examiner never did that. We never had an opportunity to respond to that. The board says Barrett provides the motivation. Did you raise a question about new ground of rejection in your brief? I'm sorry, I may be forgetting. Have we raised the new ground of rejection in the brief? We did, Your Honor. It's there. I can give you the site. On page 26 and page 27, we point out that this entire analysis is a new ground of rejection. But what the board's doing is they're trying to have it both ways. The board actually says Barrett motivates doing this in a donut. That's almost a direct quote. The board says our claim may be obvious over Barrett. When it goes to establishing a prima ficia case, they readily draw a connection between Barrett and a donut. But when it comes to our rebuttal evidence, the Urbanski declaration and Barrett, they don't give meaningful consideration to those because those are, according to the board, in a donut. I'm going to stop you here. You've exhausted your rebuttal time, so I'm going to have you sit down and we'll restore two minutes of rebuttal. Thank you. Thank you, Your Honors. May it please the court. I just have two things to say and then I'll be happy to answer questions. Killebois, Vincente, and Williams all relate to donut dough and they set forth the claimed invention, the disputed ingredients. I think, Your Honor, Judge Hughes said on it, as I've been thinking about it precisely, that Williams talks about enzymes, plural, and in like three lines it covers basically all three enzymes, plural, alpha-amylase, glycerin, and the other two references talk about maltogenic amylase being a great anti-staling agent. And then the other thing I'd like to address. And they all deal with donuts. Yes, Your Honor. And then the other thing I'd like to address is the board issued no new ground of rejection here. It employed the same rationale as the examiner that all these references and Barrett and Urbanski were in play and the board followed exactly what the examiner did and that was combine the references with their suggestions about what are good enzymes for anti-staling agents. And Killebois and Vincente speak to that and the board and the examiner addressed Barrett and the declaration. So there was no new ground here. If the court has any questions. Yeah, I have a question. Do you concede that Barrett is a teaching away? No, Your Honor. It is some evidence in the record and when it came into the record it actually conflicted with the 10% improvement. The reference according to appellant teaches a decay, teaches some adverse result and the claim has a 10% improvement. So to reconcile those two, they can't both be true. They are polar opposites. One way as the board and examiner said applicant could have reconciled well what is the true value of Barrett and how could bread lasting for years relate to doughnuts lasting for hours. Applicant talks about doughnuts lasting hours and a few days at page 95 of the record in his specification. And then the board, I think, and the examiner were eminently reasonable in saying we have a conflict here or you haven't shown us results. We have plenty of time so you can talk more slowly. Sure, Your Honor. I don't have too much to say only that. Well, I guess I'm not clear what you're saying because I mean teaching away in my mind at least is you've got three references. They deal with doughnuts and they suggest that using one of the three ingredients leads to anti-scaling. If you have another reference that demonstrates or shows or leads to an expectation that using those three ingredients are not going to achieve anti-scaling, why isn't that a teaching away? Well, except for I know you're saying that's bread not doughnuts. But other than that argument, why is it not a teaching away? Well, thank you, Your Honor. It's teaching away evidence that there was some evidence that as to bread lasting for years and what the board said and it was very legitimate is that if you have a claim that says I increased performance 10% by using A, B, and C and then you have which applicant has been strongly relying on a reference that says wait a second look at this data it's rock-solid A, B, and C produce a decay and so it's entitled to little weight if any weight the board and examiner were saying is that there's a teaching away putting aside the bread doughnut difference that if the reference is suggesting that the three parts of the three ingredients in the patent produce bad results that the ordinary person would not think to combine those three results to get the good results. Thank you, Your Honor. It's teaching away evidence that is strongly outweighed by the obviousness which the board weighed and teaching away is a finding of fact and this court has said in cases such as Fulton, Pair Ordinance and New Tech. Oh, I get what you're saying. You agree that the reference teaches away but overall the prior art the board found doesn't teach away and substantial evidence supporting that conclusion is the other ones. Absolutely, Your Honor, that the board. I think that's just what we're doing or at least I'm referring as evidence doesn't teach away but it clearly teaches away. It's just not enough to overturn the board's factual finding. Absolutely, Your Honor. It's a little bit of evidence that is one inconsistent with the claims asserted improvement. Yeah, but that's always true of teaching away. That's the point of the reason one deserves a patent because it was an unexpected result. It was something that there was no motivation to combine, right? I mean, so that's a given, right? I mean, there's going to be. There's plenty of. He shouldn't be penalized by the fact that there's a reference out there that teaches away. He should be given credit for that, right? Yes, Your Honor and the board did just that. The board reviewed the examiner's rationale that when you put that Williams is a great reference in like 20 words, it hits enzymes, it hits alpha amylase, it hits multigenic amylase and Vincente and Killebaugh fill in the gap and that is a very strong obviousness case and cases such as Ingray Young of this court say that any teaching away evidence and the court affirmed in that case does not eliminate the other prior art references from the prior art. They are still considered and weighed for the forcefulness of what they show and hear as board. Mr. Piccolo, we agree you have to take each case on its merits, but here you have the three separate components that have a certain effect. None is as much as a 10% improvement. The only reference that puts them together says it doesn't help, doesn't make any difference. Why would it be obvious? Where is the motivation to nonetheless take this step or even to try it when you've been told by confident people nobody questions the results in Barrett? So you're telling us that you ignore the teaching away. You can't do that. You have to give it the weight that it acquires by existence. It's very hard for me to see why anybody in view of Barrett would take these three components, fails in breadth and put it in a case where you're smart enough to know that doughnuts are processed at different temperatures or preserved for different purposes, might think about it, but that's not a motivation that negates patentability, is it? Your Honor, I think I understand your question and that is that my answer is that Williams, and I said this before, Williams, Vincente, and Killebois set forth much evidence because Williams says in doughnuts use alpha-amylase and glycerin. It's close to anticipation because it also says enzymes, plural, so we are almost like at the five-yard line of proving obviousness almost anticipation. From Williams, you then have on page, respectfully inviting the Court's attention, to page 47 of the record, Vincente in column 11 says that, hey, a great enzyme is maltogenic amylase. Use it in doughnuts because it prevents staling. And similarly, Killebois is even more substantial evidence to support the Board's findings. So here we might have like an in re jolly situation where there's some findings in teaching a ways, a finding of fact, as this Court has held many times over, and here we have much substantial evidence supporting the Board's teaching toward. I'd like to think of it as instead of what's the inverse of teaching way, it's teaching toward. There's still a finding and the Board had a lot of evidence on its side and maybe another outcome is plausible. And here, as the Board said, you have a chance to test your product that you're claiming 10% improvement on and you could show us in two ways. You could give us unexpected results evidence or you could give us evidence that transforms Barrett from about military ready-to-eat meals lasting years. In I don't want to eat a doughnut after several days. So it was not on all fours with the claimed features of doughnut and 10% improvement. And the examiner said before the appeal to the Board, give us, you know, something to connect Barrett with your claim and applicant chose not to. And the Board said the same thing. And in the end... You're telling us that ordinarily it would have obvious at least to try these three components together. But however, Barrett did try them and found that it failed. So isn't that a very strong piece of consideration for those who say nonetheless, well, I'm going to do it anyway and see what happens? Your Honor, thank you. It did not fail. Barrett showed mixed results. For example... But it didn't provide a significant extension as I recall. It had... I'm sorry, Your Honor, if I'm understanding, Barrett has the maltogenic amylase plus alpha amylase combination two times in its test data. And we made this point in our brief, U3 and U200. And so for example, in table four, going down the ingredients, U3 glycerol. So Barrett teaches a bunch of things and it's some evidence in applicant's favor. But the Board, when faced with the question of fact of teaching toward or teaching away, has a lot of evidence supporting that finding. And that's our position. And we think that such as in cases like in Ray Jolly or so, this Court should not decide it, you know, from the Board's perspective, but should review it with is there more than a scintilla of evidence supporting the Board's finding. And we say there is throughout Killebois, Vincente, Williams, and the Board's reasonable analysis about when you have a claim to something that is the bipolar opposite of a reference you're relying on. At least show us how to get from that reference to your chosen claim language. If the Court has no further questions, I'll take my seat. Thank you, Your Honors. Okay. I'd like to address just a couple things that were said there. One is that the solicitor said that we failed to, we were asked to present evidence to connect Barrett to what happens in a donut and we failed to do that. That's not the case. The Urbanski Declaration is in, it is factual evidence exactly on that point. The Urbanski Declaration, it looks at Barrett, he reads Barrett, he reads the references, and he, Dr. Urbanski states that the Barrett reference would be far more informative and persuasive. Dr. Urbanski in his testimony in that declaration draws that connection. The second thing I want to bring up is that the solicitor just conceded that Barrett teaches away from the invention. Now, I understand that he disputes the weight to be given to it, but he concedes that it teaches away. The rejection, I'm reading from page A11 of the Board's decision, the rejection says Barrett further supports the motivation to in a batter. If what he has just conceded that it teaches away, then this statement simply cannot be, it cannot be correct. Either it teaches away or it teaches toward. The Board has said it teaches toward, the solicitor just says it teaches away. Now... What do we do with that? I mean, if we agree that their analysis of Barrett is just flat out wrong, but there's still other substantial evidence supporting not teaching away, don't we still have to affirm? I think that this court has addressed this in the case in Ray, let me hope I get this right, Vedianathan, which says that where there are conflicting factual findings, and these are irreconcilably conflicting, that there's no deference given to the Patent Office on those findings. That substantial evidence just does not apply anymore. And so I would suggest that on this record, that it can just be reversed. It's unrebutted by Urbanski and Barrett that this combination, the closest priority, Barrett, teaches away from this invention. I see that my time is up, and I just want to address one other thing, which is the examiner offered several post hoc rationales there. His view of Barrett, his view of MRE roles, these aren't things that the board addressed, and so those should not be considered in the record. Thank you. Thank you. Thanks both counsel, the case is closed.